# IN THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| FLORENCE HENDERSON,<br>for her minor child, K.H, )<br><br>Plaintiff, )<br><br>v. )<br><br>CAROLYN W. COLVIN, Acting )<br>Commissioner of Social Security, )<br><br>Defendant. ) | No. 13-cv-4438<br><br>Honorable Michael T. Mason |

## <u>MEMORANDUM OPINION AND ORDER</u>

Michael T. Mason, United States Magistrate Judge:

Florence Henderson ("Henderson"), on behalf of her son, K.H., brings this motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied K.H.'s claim for Supplemental Security Income ("SSI") under Section 1614(a)(3)(C) of the Social Security Act (the "SSA"), 42 U.S.C. § 1382c(a)(3)(C)(i). The Commissioner filed a cross-motion for summary judgment, requesting that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, Claimant's motion for summary judgment is denied and the Commissioner's cross-motion for summary judgment is granted.

I.    BACKGROUND

   A. Procedural History

      On April 30, 2010, Henderson filed an application for SSI, on behalf of her son K.H., a child under the age of 18, alleging an onset of disability of April 30, 2010 due to speech language delay and asthma. (R. 20). The Social Security Administration initially denied his claim on September 30, 2010, and upon reconsideration on February 15, 2011. (R. 20, 60, 68). Henderson then filed a timely request for a hearing on March 5, 2011. (R. 20, 73-74). On March 2, 2012, Henderson and K.H., without legal representation, appeared before the Administrative Law Judge ("ALJ"), Jose Anglada. (R. 20, 37). On April 3, 2012, ALJ Anglada issued a written decision denying Henderson's request for SSI. (R. 20-31). On April 19, 2012, Henderson filed a Request for Review, and on May 18, 2013, the Appeals Council denied this request, which made the ALJ's decision the final decision of the Commissioner. (R. 1-4, 15); *Zurawski v. Hatler*, 245 F.3d 881, 883 (7th Cir. 2001). Henderson subsequently filed this action in the District Court seeking review of that decision.

   **B. Medical Evidence and School Records**

      The ALJ based his decision to deny SSI on his review of both the medical evidence and school records made available, as well as the testimony presented at the March 2, 2012 hearing. The records show that K.H. first received an occupational therapy evaluation on June 10, 2008, after his mother had expressed concerns regarding K.H.'s speech development to his pediatrician. (R. 205-208). K.H. was 2 years and 2 months old at the time of the first evaluation. (R. 205). Evaluator Suresh Karra noted that K.H. was born prematurely at 36 weeks gestation via C-section. *Id.*

Karra indicated in her evaluation that K.H. had a 23% delay in grasping and a 20% delay in visual motor integration. (R. 206). Furthermore, she found that K.H. had a 15% delay in "self-help skills" such as dressing, sleeping and grooming, as well as a 24% cognitive delay, a 24% social-emotional delay, and an 8% gross motor delay. (R. 206-07). Karra stated that although K.H. showed no significant delays in any evaluated area of fine motor or self-help skills, he may be eligible for Early Intervention Services in the State of Illinois due to his 31% delay (18 month age equivalency) in speech development. (R. 207-08). Thus, Karra recommended intervention in language, speech and communication development. (R. 208). That same day, K.H. and Henderson were referred for further speech evaluations by Santosh Mundada. (R. 217-220). Mundada noted that K.H. had a 23% delay (20 month age equivalency) in expressive language and a 46% delay (14 month age equivalency) in receptive language. (R. 219). Mundada also suggested that K.H. may be eligible for Early Intervention Services due to his 30% or greater delay in speech development. (R. 219-20).

An Early Intervention Service Plan was initiated for K.H. on June 14, 2008, listing the primary diagnosis as a "mixed developmental disorder." (R. 224-25). The evaluation listed K.H.'s initial assessment scores from Evaluator Karra, and then gave him a "Somewhat" rating (5 out of 7, with a score of 7 equaling "Completely") for his "positive socio-emotional skills," "acquiring and using knowledge skills" and "taking appropriate action to meet needs." (R. 227-29). The plan then called for two different types of therapy: Speech Language Therapy and Developmental Therapy. (R. 231-32, 255-57). The Speech Language Therapy consisted of 180 minute Speech Therapy

Assessments twice per authorization, 60 minutes of Speech Therapy IFSP (Individual Family Service Plan) Development once per month, and 60 minutes of Individual Speech Therapy Services once per week. (R. 257). The Developmental Therapy consisted of 180 minute Developmental Therapy Assessments twice per authorization, 60 minutes of IFSP Developmental Therapy once per month, and 60 minutes of Individual Developmental Therapy Services once per week. (R. 255)/

K.H. continued to receive speech evaluations from Santosh Mundada. (R. 213-216.) On November 11, 2008, Mundada noted that Henderson reported improvements in K.H.'s communication skills from the earlier June 10 testing, but noted K.H. continued to struggle with completing sentences. (R. 213). The test revealed that K.H. had a 26% delay (23 month age equivalency) in expressive language and a 35% delay (20 month age equivalency) in receptive language, which made him eligible for continued therapy. (R. 215-16).

Further testing through Mundada was completed on February 25, 2009, with Henderson reporting that K.H. had been making progress in his communication skills. (R. 201, 209). The testing showed continued improvements from the initial June 10 test, with K.H. at a 31% delay (24 month age equivalency) in expressive language and a 26% delay (26 month age equivalency) in receptive language, which made him eligible for continued therapy. (R. 203, 211). Mundada noted that, under receptive language skills, K.H. made good eye contact, responded to his name, followed simple instructions, and could identify objects and pictures, but that K.H. was "inconsistent" with common adjectives/adverbs and needed cues to follow long sentences. (R. 202, 210). Under expressive language skills, K.H. used words and short phrases to express

4

needs, named noun pictures and a few action word pictures, but was not able to tell his name on command and needed simple cues to maintain conversation and answer simple questions. *Id.* When K.H. turned three years old on March 30, 2009, he no longer qualified for Early Intervention Services and transitioned to services in the Chicago Public School System. (R. 242-43).

K.H. had a "Health Maintenance Exam" at the University of Chicago Medical Center on May 5, 2009. (R. 329-331). At that time, Dr. Meghan Mullin noted that K.H. had a history of a "speech and developmental delay," as well as a reactive-airway disease. (R. 329). Dr. Mullin assisted with paperwork so that K.H. could continue to receive therapy services once he began preschool in the fall, and also wrote him a new prescription for albuterol for his asthma. (R. 330-331).

On June 5, 2009, K.H. and Henderson attended an Individual Educational Program ("I.E.P.") meeting with their I.E.P. team. (R.260-271). The I.E.P. labeled K.H.'s "disability" as a "speech/language impairment." (R. 260). K.H.'s "Specialized Instructions" within his I.E.P. provided for services and benchmarks to be met in "Independent Functioning" and "Speech/Language." (R. 266-68). The plan called for a total of 45 minutes of direct services in class per week, 30 minutes as it related to "Independent Functioning" and 15 minutes as it related to "Speech/Language." (R. 270).

On June 2, 2010, K.H.'s Head Start pre-kindergarten teacher at Jackie Robinson Elementary School, Rosalyn Mauston, completed a teacher questionnaire in order to assist with K.H.'s application for SSI. (R. 131-138). In her evaluation, Mauston marked "No problems observed in this domain; functioning appears age appropriate" for

"Acquiring and Using Information," "Attending and Completing Tasks," "Interacting and Relating with Others," and "Caring for Himself." (R. 132-34, 136). Mauston indicated that she could understand "no more than half" of the speech from K.H. when the topic of conversation was known, unknown or even after repetition. (R. 135).

After K.H. completed his first year of preschool, his I.E.P. team met again on June 15, 2010. (R. 273-290). The I.E.P. continued to label K.H.'s "disability" as a "speech/language impairment." (R. 273). The I.E.P. prepared in the wake of that meeting noted that K.H. continued to need academic assistance with letter and number recognition, and that he displayed a decrease in his fine motor skills. (R. 277). Under the "Specialized Instructions" for "Independent Functioning," the I.E.P. noted that K.H. can identify some letters and colors, can imitate vertical and horizontal lines, a circle, and can snip with scissors but not cut on a straight line. (R. 282). Under the "Specialized Instructions" for "Speech/Language," the I.E.P. reflected that K.H. had been working on number (1-5) and letter recognition, but could not recite the alphabet. (R. 283). Furthermore, it noted that while he could name pictured objects and speak using simple phrases, he still required cues for sequencing simple events, identifying actions and functions of objects, answering questions following simple stories, and recognizing colors. (R. 277, 283). K.H.'s I.E.P. maintained the 45 minutes of direct services in class per week for both "Independent Functioning" and "Speech/Language," and added 8 minutes for "Health/Medical" to monitor K.H.'s asthma. (R. 287).

On July 17, 2010, K.H. was evaluated by the SSA-selected speech and language pathologist DiAnne Bielinski for the Bureau of Disability Determination Services. (R. 334-36). Bielinski noted at the beginning of her evaluation that no prior reports were

submitted to her and that she spent 30 minutes with K.H. (R. 334). K.H. was 4 years, 3 months at the time of the evaluation. *Id.* Bielinski found that K.H.'s speech intelligibility was 90% in conversational speech to an unfamiliar listener when the topic was unknown. *Id.* In his Language Evaluation, K.H. received an age equivalent score of 3 years, 2 months on the Listening Comprehension Section, and an age equivalent score of 3 years, 5 months on the Oral Expression section, both low average scores. (R. 335). Overall, K.H. received an age equivalent score of 3 years, 2 months on the Language Evaluation. *Id.* Additionally, Bielinski found that K.H.'s voice, fluency and hearing all appeared normal. *Id.* Thus, Bielinski did not recommend that K.H. receive speech and language therapy. *Id.*

On September 18, 2010, state agency reviewing physician Francis Vincent, M.D., along with the assistance of state agency speech-language pathologist Michelle Curran, S.L.P., completed the initial "Childhood Disability Evaluation Form" related to K.H.'s application for SSI due to a "speech and language delay" and "asthma" limitations. (R. 337-342). Dr. Vincent checked that K.H.'s "impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings." (R. 337). In his evaluation of the six domains, Dr. Vincent noted that K.H. has no limitation in four of the domains: "Acquiring and Using Information;" "Attending and Completing Task;" "Moving and Manipulating Objects;" and "Caring for Yourself." (R. 339-340). Dr. Vincent found that K.H. has a "less than marked" limitation in "Interacting and Relating with Others," noting that K.H. omitted the "s" sound, but had speech intelligibility of 90% in conversational speech, age appropriate voice and fluency skills, as well as age appropriate pragmatic skills. (R. 339). Finally, Dr. Vincent found K.H. to have a

7

"marked" limitation in "Health and Physical Well-Being," noting that K.H. had a history of asthma that was controlled with medication. (R. 340). Dr. Vincent concluded that while the allegations of limitations are credible in light of the medical evidence, the "extent of the limitations described by the claimant in terms of symptoms, exceeds that supported by the objective medical findings." (R. 342).

On October 27, 2010, Henderson took K.H. to see Dr. Mary Ellen Acree at the University of Chicago Medical Center. (R. 351-53). Dr. Acree reviewed K.H.'s I.E.P. which indicated that K.H. has struggled with numbers and colors. (R. 351). She also noted that Henderson stated that she and K.H. work together at home on colors and letters, but that the two of them quickly become frustrated and are not making progress. *Id.* At the end of her summary report, Dr. Acree noted a "possible development delay." (R. 353). She indicated that K.H.'s speech was "very appropriate on exam," but that she was more concerned about his inability to identify numbers, colors and letters. *Id.* Thus, she referred Henderson and K.H. to the Development Pediatrics Practice at the Medical Center. *Id.*

On November 30, 2010, Henderson and K.H. again met with Dr. Acree at the Medical Center for a follow up. (R. 348-350). Dr. Acree noted that Henderson had not scheduled an appointment with the Development Pediatrics Practice. (R. 350). Dr. Acree noted that she was reassured, however, because K.H. was receiving treatment through his I.E.P. *Id.* Finally, Dr. Acree indicated that K.H. "definitely has a delay, given that he is unable to speak in full sentences at this point." *Id.*

On February 11, 2011, state agency reviewing physician Cosme Cagas, M.D., along with the assistance of state agency speech-language pathologist Carol Varney,

S.L.P., completed a "reconsideration" of the "Childhood Disability Evaluation Form" related to K.H.'s application for SSI. (R. 377-382). Like Dr. Vincent, Dr. Cagas checked that K.H.'s "impairment or combination of impairments is severe, but does not meet, medically equal, or functionally equal the listings." (R. 377). However, in her evaluation of the six domains, Dr. Cagas noted that K.H. had no limitation in three of the domains: "Attending and Completing Task;" "Moving and Manipulating Objects;" and "Caring for Yourself." (R. 379-380). Dr. Cagas found that K.H. had a "less than marked" limitation in the other three domains: "Acquiring and Using Information;" "Interacting and Relating with Others;" and "Health and Physical Well-Being." *Id.* In conclusion, the form noted that the reconsideration was made with "no new speech and language allegations made and no new speech and language evidence submitted." (R. 382).

On October 14, 2011, Monica Delgado, K.H.'s kindergarten teacher at Ariel Elementary Community Academy, made a request to Amy Hillier, the Special Education Teacher, for K.H. to receive a special education evaluation at his upcoming I.E.P. meeting. (R. 421-25). Henderson received notice of this request which stated that K.H. had not made progress in his speech and occupational therapy, and was not recognizing his letters, letter sounds, or numbers past 15. (R. 422-23). It was determined that K.H. would receive the special education and related services as listed in the November 4, 2011 I.E.P. (R. 424).

K.H.'s I.E.P. team met again on November 4, 2011 and then revised his I.E.P. for the coming school year on November 22, 2011. (R. 383-415). The I.E.P. continued to label K.H.'s "disability" as a "speech/language disability." (R. 383, 399). The I.E.P. continued to note that K.H. was able to copy things, but that he needed assistance with

letter and number recognition and had difficulty learning new information. (R. 400).
Two test were administered to K.H. to measure his literacy and his math readiness. *Id.*
K.H. scored in the intensive range for the literacy test, meaning he was at high risk, after
he could not identify any letters when he should have been able to identify eight letters.
*Id.* On the math test, K.H. could only count to ten when he should have been able to
count to twenty-five. *Id.* Under the "Specialized Instructions" for "Speech/Language,"
the I.E.P. noted that K.H.'s classroom teacher reported that he had been working on
letter and number recognition, but that he continued to have difficulty with attention and
retention of information. (R. 406). The I.E.P. noted that K.H. had been working on
answering questions in the classroom and that he had met his goals in this area. *Id.*
Under the "Specialized Instructions" for "Independent Functioning," the I.E.P. found that
K.H. had made progress from previous occupational therapy goals, including being able
to copy shapes and being able to copy his first and last name with verbal cues for letter
formation. (R. 408). However, the I.E.P. noted that K.H. continues to require one-on-
one assistance to complete these "fine motor task in a timely manner as it is an
unpreferred task and he is easily distracted by visual and auditory input." *Id.* K.H.'s
direct services in class were changed to 15 minutes per week of "Speech/Language"
services within the classroom, and 30 minutes per week of "Independent Functioning"
services outside of the classroom in a separate class. (R. 410).

On November 10, 2011, K.H. visited Dr. Acree at the University of Chicago
Medical Center to complete a follow up on his asthma and "developmental delay." (R.
426-429). The report noted two episodes in the last year where K.H. required medical
attention, one for surgery on an umbilical hernia and another after fracturing his left

letter and number recognition and had difficulty learning new information. (R. 400).
Two test were administered to K.H. to measure his literacy and his math readiness. *Id.*
K.H. scored in the intensive range for the literacy test, meaning he was at high risk, after
he could not identify any letters when he should have been able to identify eight letters.
*Id.* On the math test, K.H. could only count to ten when he should have been able to
count to twenty-five. *Id.* Under the "Specialized Instructions" for "Speech/Language,"
the I.E.P. noted that K.H.'s classroom teacher reported that he had been working on
letter and number recognition, but that he continued to have difficulty with attention and
retention of information. (R. 406). The I.E.P. noted that K.H. had been working on
answering questions in the classroom and that he had met his goals in this area. *Id.*
Under the "Specialized Instructions" for "Independent Functioning," the I.E.P. found that
K.H. had made progress from previous occupational therapy goals, including being able
to copy shapes and being able to copy his first and last name with verbal cues for letter
formation. (R. 408). However, the I.E.P. noted that K.H. continues to require one-on-
one assistance to complete these "fine motor task in a timely manner as it is an
unpreferred task and he is easily distracted by visual and auditory input." *Id.* K.H.'s
direct services in class were changed to 15 minutes per week of "Speech/Language"
services within the classroom, and 30 minutes per week of "Independent Functioning"
services outside of the classroom in a separate class. (R. 410).

On November 10, 2011, K.H. visited Dr. Acree at the University of Chicago
Medical Center to complete a follow up on his asthma and "developmental delay." (R.
426-429). The report noted two episodes in the last year where K.H. required medical
attention, one for surgery on an umbilical hernia and another after fracturing his left

distal humerus. (R. 426). Dr. Acree noted that K.H. rarely needed his albuterol ("less than once per month"). *Id.* Additionally, Dr. Acree noted that Henderson had shown her K.H.'s November 4 I.E.P. paperwork and noted that K.H. needs both occupational and speech therapy at school. *Id.* Dr. Acree stated that she scheduled Henderson to see a developmental pediatrician at UIC (University of Illinois-Chicago) and that their appointment was slated for December 14, 2011. *Id.*

K.H.'s kindergarten report card for the 2011-2012 school year was also produced which gave a "development" rating for specific skills in reading and math. (R. 162-64). As it related to K.H.'s speech issue, the report card indicated that many skills were "beginning to be developed," such as identifying and matching sounds to symbols and expressing ideas and needs in complete sentences. (R. 164).

### C. Claimant's Testimony

At the hearing before the ALJ on March 2, 2012, Henderson, without thte representation of an attorney, testified on behalf of K.H. (R. 37-57). Henderson testified that K.H. was 5 years old and in kindergarten at the time of the hearing. (R. 47). She further stated her daughter and grandson live in the house with them, and that she was not currently working. *Id.*

Henderson explained that K.H. was struggling in school and that his kindergarten teachers did not think K.H. could progress to the next grade. (R. 48). She stated that K.H. does not know how to write his own name and that she has to do it for him, and that he also struggles with colors and shapes. *Id.* She testified that she worked with K.H. on his homework and that they used other activity books that his teacher had supplied them. (R. 49). However, Henderson admitted that she does not have certain

11

educational toys, such as different shapes, that K.H. can use at home. (R. 49-50).
Henderson explained that K.H. receives homework every day and that he is unable to
do it on his own. (R. 51). She stated that he needs constant supervision and
assistance in order to complete his homework, otherwise, he will not finish it. *Id.* If K.H.
was given a choice, Henderson stated he would rather watch T.V. than do his
homework. (R. 52). Henderson testified that K.H. likes to watch the T.V. show
"SpongeBob" and that he also enjoys getting on the computer to play games. (R. 52,
55-6).

Henderson stated that she wakes up at 7:00 a.m. each school morning and that
she wakes K.H. up at 7:30 a.m. (R. 52). She said that K.H. is in bed each night by 8:30
p.m. (R. 53). Henderson explained that K.H. does not want to go to school each
morning despite getting that much sleep. *Id.* When asked directly by the ALJ why he
does not want to go to school, K.H. replied "I don't want to go to school." *Id.*
Henderson continued by stating that K.H. eats breakfast at school. (R. 54). She
testified that K.H.'s school is "around the corner" from their apartment and that she
walks him to school each morning. *Id.* Henderson stated that the school offers after-
school activities, but that K.H. does not participate in any because the programs cost
money. *Id.* She stated that K.H. completes all of his homework at home. *Id.* When
asked by the ALJ if K.H. gets along with other students, Henderson responded that his
teacher says that he does get along well with others. (R. 54-5).

Henderson testified that there are no physical problems with K.H. (R. 55). She
stated that K.H. uses Albuterol, or an over-the-counter asthma pump, to treat his
asthma. (R. 55-6). She also stated that K.H. is not on any other medication. (R. 55).

She testified that the asthma pump was working fine for his treatment of asthma and that K.H. had not had any emergency room visits or hospitalizations. *Id.* Finally, Henderson testified that K.H. does not receive any physician treatment for his asthma. (R. 56).

### D. The ALJ's Decision

On April 3, 2012, the ALJ issued a written decision denying Henderson's request on behalf of K.H. for SSI. (R. 20-31). The ALJ went through the three-step sequential evaluation process created by the SSA (20 CFR 416.924(a)) to determine whether K.H., an individual under the age of 18, was disabled. (R. 20). First, the ALJ determined that K.H., a six-year-old boy, was not engaged in any substantial gainful activity. (R. 23). Next, the ALJ determined that K.H. had the following severe impairments that affected his daily functioning: asthma, and speech and language delay. *Id.* Finally, the ALJ determined that neither impairment, nor the combination of the impairments, met or was medically equal to the severity of one of the listed impairments. *Id.* The ALJ noted that, in so determining, he reviewed and considered all of the listings under the Listings of Impairments. *Id.*

E. Additional Evidence Submitted after the ALJ's Decision

After the ALJ issued his decision, Henderson, through her newly acquired attorney, submitted three additional pieces of evidence on June 1, 2010. (R. 166-197). Her attorney argued in a letter to the Appeals Council that Henderson was unaware of what evidence might be relevant to K.H.'s SSI claim and thus had not submitted either of the two additional pieces of evidence. (R. 197). Henderson's attorney argued that

these additional pieces of evidence showed more significant learning disability than those addressed at the hearing which would ultimately warrant a remand. *Id.*

First, Henderson submitted a one-page "CONNORS 3" evaluation. (R. 166.) The Multi-Health System, Inc., which publishes the "CONNORS 3," states on its website that the evaluation "offers a thorough assessment of ADHD."[1] The evaluation was completed by K.H.'s kindergarten teacher, Monica Delgado, at Ariel Elementary Community Academy on December 15, 2011. (R. 166). The evaluation contained thirty-nine statements (e.g., "Is constantly moving") from which the evaluator was to select a number, 0 – 3 (0 = not true at all, 3 = very much true), to best answer each statement. *Id.* The evaluation is poorly produced and hard to read. *Id.* However, it is clear that K.H. scored twenty "0" scores from Delgado. *Id.* At the bottom, Delgado commented that K.H. was struggling academically and at retaining skills, but that he was very friendly and well-mannered. *Id.*

Second, Henderson submitted K.H.'s I.E.P. from March 16, 2012. (R. 167-188). For the first time, the I.E.P. labeled K.H.'s "disability" as a "developmental delay." (R. 167). The I.E.P. stated that K.H.'s strengths included being able to rote count to ten, recognize the "K" in his name, write three letters to represent his name, identify colors when shown an object of that color, and answer "what" and "where" questions. (R. 169). Further, it stated that K.H. positively interacts with his peers and that functionally, he can attend to a given task and complete independent work at his level. *Id.* The I.E.P. continued to note that K.H. needs to work on letter recognition and being able to count higher than ten. *Id.* The I.E.P. described K.H. as a "visual and tactile learner" who works best when he is able to see an example and or have a teacher model what is

---

[1] http://www.mhs.com/product.aspx?gr=edu&id=overview&prod=conners3

being asked of him. (R.169-170). Additionally, the I.E.P. noted that K.H. took two assessments during the winter of his kindergarten year (2012), the Dynamic Indicator of Basic Early Literacy Skills (DIBELS), and the MCLASS which measures early math skills. (R. 169). K.H. scored in the "high risk deficit intensive" area in reading on the DIBELS and scored in the "intensive" category on the MCLASS. *Id.* Finally, the I.E.P. noted that K.H. is "developmentally" performing at an age appropriate level. *Id.* All of the above information was repeated in the "Specialized Instructions" sections of his I.E.P. (R. 176-181).

The I.E.P. also contained a section on accommodations that K.H. would receive in each of his classes. (R. 173-175.) For each of K.H.'s classes (Language Arts/English Reading, Mathematics, Biology & Physical Sciences, Social Sciences, World Language and Investments) K.H. was to receive 25% extended time when completing assignments as well as an explanation of directions and concrete examples for each assignment. (R. 173-74.)

Finally, the I.E.P. has two sections which break down K.H.'s direct services in his regular classes and in a separate class, one section for the 2011-2012 school year and another for the 2012-2013 school year. (R. 182-185.) For the 2011-2012 school year, the I.E.P. stated that K.H. was eligible for 30 minutes per week of direct services in class for both "Language Arts/English/Reading" and "Mathematics," as well as 30 minutes per week of direct services in a *separate* class for "Independent Functioning" and 90 minutes per week of direct services in a *separate* class for both "Language Arts/English/Reading" and "Mathematics." (emphasis added, R. 182.) For the 2012-2013 school year, the direct services in the regular class stayed the same, but the 90

15

minutes per week of direct services in a *separate* class for both "Language Arts/English/Reading" and "Mathematics" increased to 105 minutes per week. (R. 184.)

The third piece of additional evidence Henderson submitted was an "Eligibility Determination Meeting" form dated March 16, 2012, which was used by K.H.'s I.E.P. team to determine whether K.H. suffered from a specific learning disability. (R. 189-196). The form summarized K.H.'s performance on additional assessments. (R. 191-92). For "Academic Performance," K.H.'s composite score was within the "well below average" range on the KSEALS, which tests numerous skills within early childhood development.[2] (R. 191). In particular, he scored in the average range for vocabulary, but fell in the well below average range for expressive skills and receptive skills, and the lower extreme range for numbers, letters and words. *Id.* For "General Intelligence," K.H. demonstrated cognitive functioning within the average range on the RAIS, which tests intelligence[3], also revealing that K.H. has a preference for tasks requiring non-verbal reasoning rather than verbal reasoning. *Id.* Under "Communication," the form noted that K.H. does not have a communication impairment that adversely affects his education performance. *Id.* Finally, under the "Motor Abilities" section, K.H. demonstrated average general visual perception skills based on the results of the DTVP-2 test, but it noted that he had difficulty recognizing incompletely drawn figures which may be "contributing to [K.H.'s] difficulty with shape, letter, symbol, etc. recognition and recall and indicates a potential deficit in his visual perception/discrimination skills." (R. 192).

---

[2] http://www.academictherapy.com/detailATP.tpl?action=search&eqskudatarq=DDD-804
[3] http://www4.parinc.com/Products/Product.aspx?ProductID=RIAS

16

The form noted the history of K.H.'s speech therapy services, including that they have been unable to correct K.H.'s receptive and expressive language delay, but also mentioned that K.H.'s attendance at school has been "inconsistent or poor and efforts to address these factors have not been successful," which in turn "may be additionally negatively impacting his performance." (R. 192). The form checked off that a disability was identified, calling the disability a "developmental delay," while further stating that K.H.'s disability adversely affects his educational performance and it requires special education and related services to address the disability, making K.H. eligible for special education and related services. (R. 194).

I.    LEGAL ANALYSIS

  A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether the claimant is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "displace the ALJ's judgment by reconsidering the facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The court's task is to determine whether the ALJ's decision is supported by "substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (quoting *Barnett v. Barnett*, 381 F.3d 664,, 668 (7th Cir. 2004)). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not

disabled." *Similia v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, a remand is required." (*Hopgood ex. rel. L.G. v. Asrtue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B. Analysis under the Social Security Act

A child is disabled within the meaning of the Social Security Act if he has a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(l).  In determining whether a child meets the definition, the ALJ engages in a three-step analysis: (1) if the child is engaged in substantial gainful activity, then his claim is denied; (2) if the child does not suffer from a severe impairment or combination of impairments, then his claim is denied; and (3) the child's impairments must meet, medically equal, or be functionally equal to any of the Listings of Impairments contained in 20 C.F.R. pt. 404, subpt. P, App. 1.  20 C.F.R. § 416.924(a)-(d).  *See also Giles ex. rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007).

To determine whether an impairment functionally equals a listing, the ALJ must assess the severity of the impairment in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical wellbeing.  20 C.F.R. § 416.926a(b)(1).  An impairment functionally equals a listing if it results in "marked" limitations in two domains of functioning, or an "extreme"

limitation in one domain. 20 C.F.R. § 416.926a(a). The ALJ here concluded that K.H. did not have an impairment or combination of impairments that meets, medically equals, or functionally equals the severity of one of the listed impairments.

## C. Analysis

Henderson, on behalf of K.H., argues that the ALJ and the Appeals Council made numerous errors requiring reversal or remand. First, Henderson argues that remand is required because the ALJ failed to consider all of K.H.'s impairments, specifically the limiting effects of his "developmental delay." Second, Henderson argues that remand is required because the ALJ failed to develop the record. Third, Henderson contends that the Appeals Council erred in finding that the evidence submitted after the ALJ's decision was not "new and material." Finally, Henderson argues that the ALJ failed to articulate his adverse credibility finding of Henderson's testimony. We address these four issues below.

### 1. The ALJ's consideration of K.H.'s impairments

Henderson first argues that the ALJ failed to "assess the interactive and cumulative effects of all of the impairments for which we have evidence, including any impairments that are not severe." 20 C.F.R. § 416.926a(a). Henderson emphasizes that the ALJ failed to take the Commissioner's "whole child" approach of taking into account all of the child's impairments. See SSR 09-1p. Specifically, Henderson argues that K.H. has been "diagnosed" with *both* a developmental delay and a speech and language delay for which the ALJ has only taken into account the speech and language delay. The plaintiff believes that both of these impairments have different limitations, and that had the ALJ considered K.H.'s developmental delay in conjunction with the

speech and language delay, he would have found that K.H. had marked limitations in the domains of "Acquiring and Using Information," as well as "Attending and Completing Tasks." The Court disagrees.

Henderson argues that her son has two separate "disabilities": one being a speech and language delay and the other being a developmental delay. Initially, those are not necessarily two separate disabilities; speech/language delays can often be characterized in the context of a larger diagnosis of a developmental delay. To the extent there are medical records referencing a "developmental delay" here, the reference is always in connection with K.H.'s speech and language issues. (R. 322, 329, 351, 353, 426, 428). This makes sense, given that the focus of K.H.'s disability application and his entire medical history has been the speech and language delay. K.H.'s application for SSI specifically identified "speech problems, asthmatic" as his "disabling illnesses, injuries or conditions." (R. 123.) The speech and language delay was always the central issue with regard to any mention of a developmental delay in the medical evidence or the school records.

The real issue is not whether the ALJ correctly identified K.H.'s specific delay, but whether the ALJ considered all of the limitations of K.H.'s impairment that were reflected within the evidence available to him. In evaluating K.H.'s impairments under the six domains, the ALJ found that K.H. had a less than marked limitation in "Acquiring and Using Information" (R. 25-26), a less than marked limitation in "Attending and Completing Tasks" (R. 26-27), a less than marked limitation in "Interacting and Relating with Others" (R. 27-28), no limitation in "Moving About and Manipulating Objects" (R.28-29), no limitation in "Ability to Care for Himself" (R. 29-30), and no limitation in "Health

20

and Physical Well-Being." (R. 30-31). The ALJ based those findings on "all the relevant evidence," which included an assessment by one of K.H.'s teachers (R.131-138), multiple CPS I.E.P. forms for the 2010 and 2011 school year (R. 273-290, 383-415), the most recent physician report from Dr. Acree in 2011, along with other physician reports and medical records (R. 426-429), the examination conducted by speech-language pathologist Dr. Bielinkski (R. 334-336), and both Childhood Disability Evaluations conducted by state agency reviewing physicians and speech-language pathologist. (R. 337-342, 377-382). Significantly, the ALJ noted that the medical evidence referenced a "developmental delay" or "possible developmental delay" when he stated that K.H. had been "referred to the Developmental Pediatrics department at the University of Chicago Medical Center (R. 25, referencing 426-429). Furthermore, the ALJ noted that "the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." (R. 25). While some of K.H.'s physicians posited that K.H. may have a possible "developmental delay," there was no follow up, no records indicating this was, in fact, the case, or that he was, as Henderson put it, "diagnosed" with such a developmental delay. Based upon the evidence, we cannot fault the ALJ for declining to recognize a "developmental delay" diagnosis. There was no such diagnosis. Nor were there any records substantiating the existence of a "developmental delay," separate and apart from his speech and language issues.

## 2. The ALJ's development of the record

Next, Henderson argues that the ALJ failed to develop the record by not inquiring, at the time of the hearing, whether there were any other I.E.P.'s or testing

records available. The ALJ has a duty to develop a "full and fair record," and this duty becomes enhanced when a claimant appears at the hearing without counsel, as Henderson did in this case. *E.g. Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). However, the Seventh Circuit has stated that it generally upholds "the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation." *Id.* "A significant omission is usually required before this Court will find that the [Commissioner] failed to assist *pro se* claimants in developing the record fully and fairly." *Id.* (quoting *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). An omission is significant only if it is prejudicial, and the claimant must set forth specific, relevant facts that the ALJ did not consider. *Id.*

The record in this case was developed sufficiently for the ALJ to properly evaluate Henderson's claim. The record before the ALJ included medical evidence, testing evaluations and school records dating from June of 2008, almost two years before the alleged onset date and the filing of K.H.'s application on April 30, 2010. (R. 205). There were no obvious gaps or omissions in the records provided. The ALJ noted at the hearing that K.H.'s most recent I.E.P. was dated November 22, 2011 and that it indicated the next proposed evaluation would take place in June of 2012. (R. 40). Thus, from the ALJ's perspective on March 2, 2011, the record was complete and no new evaluations or testing would be coming before at least June of 2012. Henderson, who was present at the hearing, said nothing about an evaluation scheduled for March 16, 2012 and nothing about an expected I.E.P. to be prepared on that date. (R. 167-188). We cannot say that the absence of another I.E.P. should have given the ALJ pause – the ALJ had no way of knowing that another would be forthcoming before a

decision could be issued. Nor can we say that the omission of the CONNORS-3 evaluation completed by K.H.'s teacher Monica Delgado was significant. The evaluation addressed ADHD, an impairment K.H. is not alleged to suffer from; indeed there is nothing in the record about ADHD, and Henderson has not claimed that as a disability. (R. 167).

### 3. The Appeals Council's considering of Henderson's "new" evidence

As explained above, after the ALJ issued his decision, Henderson requested review before the Appeals Council, and she submitted three additional pieces of evidence to support her request: (1) K.H.'s CONNORS-3 Test completed by his kindergarten teacher Monica Delgado on December 15, 2011 (R. 166); (2) K.H.'s I.E.P. dated March 16, 2012, which gave updated information for accommodations and services for the 2011-2012 and 2012-2013 school years (R. 167-188); (3) and paperwork from K.H.'s March 16, 2012 disability eligibility determination meeting with CPS which indicated that K.H. had a "developmental delay." (R. 189-196). The Appeals Council denied Henderson's request for review on May 18, 2013, finding "no reason under our rules to review the [ALJ's] decision," and that the "additional evidence" did "not provide a basis for changing the [ALJ's] decision. (R. 1-2). Henderson argues that the Appeals Council was wrong.

The Appeals Council will consider "new and material" evidence "only where it relates to the period on or before the date of the [ALJ's] hearing decision." 20 C.F.R. § 404.970(b). Evidence is considered "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." (*Schmidt v. Barnhart*, 393 F.3d 737, 742 (7th Cir. 2005) (quoting *Perkins v. Charter*, 107 F.3d 1290, 1296 (7th Cir.

1997). And "new" evidence is considered "material" if there "is a 'reasonable probability' that the ALJ would have reached a different conclusion had the evidence been considered." *Id.* (quoting *Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999). In a case where the evidence is "new and material" and it relates to the period before the ALJ's decision, the Appeals Council will evaluate the entire record, including the additional evidence, and then review the case "if it finds the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Id.*

Initially, Henderson claims that she was "unaware of what evidence the ALJ may have needed," suggesting that she did not know enough to submit the new information to the ALJ. But, even before she had an attorney, Henderson submitted multiple I.E.P.s before the ALJ, as well as medical evaluations and testing reports from June 2008 and continuing through the date of the hearing. (R. 273-290, 383-415, 205). Given this, the suggestion that Henderson was unaware that an additional I.E.P. or an additional evaluation might be important evidence for the ALJ to see rings hollow.

More importantly, the documents Henderson submitted do not meet the criteria set forth above. The "new" documents, for the most part, relate to the period of time after the ALJ's decision. The first piece of evidence, the CONNORS-3 evaluation, was completed on December 11, 2011 which predates the ALJ's decision. (R. 166). But the second and third pieces of additional evidence (the March 16, 2012 I.E.P. and March 16, 2012 disability eligibility paperwork), though dated roughly two weeks before the ALJ's actual decision on April 3, 2012, both post-date the hearing and relate to services and accommodations to be implemented moving forward – that is, after March 16, 2012. So while the documents existed a few weeks before the decision issued, to a large

24

extent, the second and third pieces of evidence do not "relate" to the period of time before the ALJ's decision.

More importantly, Henderson has not explained why any of these documents would have made a difference to the ALJ. First, as discussed above, the CONNORS-3 relates to ADHD, an impairment K.H. is not alleged to have, and it was completed by one of his teachers, not a medical professional. (R. 166). Although the new I.E.P. specifically labels K.H.'s disability as "developmental delay" for the first time, there is nothing in the substance of the I.E.P. to suggest that the I.E.P. team was seeing a new disability; rather, it appears that the team was expanding upon the services and accommodations necessary to address the same issues already seen. In fact, the new I.E.P. notes that "developmentally [K.H.] performs at an age appropriate level." (R. 169). And, significantly, Henderson offered nothing in the way of medical records to suggest that she was altering his course of medical treatment to address a new disability. In fact, no medical professional or specialist ever diagnosed K.H. with a developmental delay. [4]

### 4. The ALJ's credibility findings

Finally, Henderson challenges the ALJ's credibility findings. The ALJ is in the "best position to determine a witness's truthfulness and forthrightness." *Shideler v. Astrue*, 688 F.3d 306, 311-12 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004). Court's will not overturn an ALJ's credibility determination unless it is "patently wrong." *Id.* The Court's role is to examine whether the "ALJ's

---

[4] K.H.'s primary physician, Dr. Acree, recommended in October 2010 and again in November 2011 that K.H. see the Developmental Pediatrics Group at the University of Chicago, and it appears that Henderson did make an appointment in December of 2011, though there are no records documenting an appointment there. (R. 351-353, 426-429).

determination was reasoned and supported," and only when the "ALJ's determination lacks any explanation or support" will the Court declare it to be " 'patently wrong' and deserving of reversal." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Henderson argues that the ALJ's credibility findings; in particular, Henderson challenges the ALJ's use of boilerplate language, and she argues that the findings are logically inconsistent. After summarizing Henderson's testimony, the ALJ stated that he found the "claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms." (R. 24). He then went on to note that "the statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings." *Id.* We agree with Henderson that this "boilderplate" language has been criticized by the Seventh Circuit. But the Seventh Circuit has also said that "the use of boilerplate language is innocuous when . . . the language is followed by an explanation for rejecting the claimant's testimony." *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013). Here, the ALJ buttressed the boilerplate language with two paragraphs dealing with each of the alleged impairments, followed by a third paragraph dealing with the "opinion evidence" of the state-agency physicians. (R. 25).

Henderson also argues that the ALJ's credibility findings are logically inconsistent. Specifically, Henderson argues that it was logically inconsistent for the ALJ to state that Henderson's testimony was "consistent with [the] records" but that her statements are not credible. (R. 25). We disagree. Henderson's testimony was consistent with the records. As we understand it, the ALJ was not really discounting her

actual testimony so much as he was discounting her claim that K.H. was disabled. The ALJ noted that the medical records concerning K.H.'s asthma showed that the condition was well controlled and that the course of treatment he received was "routine and conservative." (R. 25). This was consistent, he noted, with Henderson's testimony at the hearing that his asthma did not limit his activities, that he was able to play outside, etc. (*Id.*) The records and the testimony were consistent – all pointing to a finding of not disabled, making her claim of disability incredible.

Similarly, the ALJ noted, the records concerning K.H.'s speech and language delay show that he was getting the appropriate treatment, that he was receiving occupational therapy and speech services, etc. And Henderson's testimony was consistent. But Henderson's claim that K.H. had a "marked" delay in one or more domains – a necessary finding for disability – was not supported and was, therefore, incredible. Given that the ALJ sufficiently explained his reasoning, we will not second guess his credibility findings.

## I.    Conclusion

For the reasons set forth above, the Court finds that the Commissioner's decision denying benefits was supported by substantial evidence. The Court, therefore, denies Henderson's motion for summary judgment [22] and grants the Commissioner's motion for summary judgment [29]. The decision of the Commissioner is affirmed.

Dated: August 14, 2014

ENTERED:

MICHAEL T. MASON
United States Magistrate Judge

27